**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| BROTHERHOOD OF RAILROAD SIGNALMEN, | ) ) ) | |
| Plaintiff-Counterdefendant, | ) ) | 3:13-CV-00526-RCJ-VPC |
| vs. | ) ) ) | **ORDER** |
| UNION PACIFIC RAILROAD, | ) ) ) | |
| Defendant-Counterplaintiff. | ) ) ) | |
|_____| ) | |

   This Railway Labor Act case arises out of a dispute over Union Pacific's meal expense policy. Defendant-Counterplaintiff Union Pacific ("UP") has moved to dismiss (ECF No. 5) and to enjoin Brotherhood of Railroad Signalmen's ("BRS") threatened strike (ECF No. 10). For the reasons stated herein, the Court grants both of the pending motions.

I.   **Facts and Procedural History**

   The following facts are alleged in BRS's first amended complaint (the "FAC") (ECF No. 17): BRS and UP are parties to a collective bargaining agreement (the "CBA"), which governs the performance of signal work and establishes pay rates and other rules concerning working conditions. The CBA contains several rules requiring UP to reimburse BRS-represented signalmen for "actual and necessary" meal expenses incurred while they are assigned to work away from their home stations.

   On July 16, 2013, UP promulgated a new policy memorandum entitled, "Expense Reimbursement Policy for Agreement Employees" (the "July 16 Expense Policy"). The new policy effectively capped daily meal expenses, including tax and tip, at $30.00 per day, because it required employees to submit requests for reimbursement through the on-line "Time Entry

1

Portal" (the "TEP"), which did not accept requests for reimbursement of more than $30.00 per day. This new policy effectively prevented employees from seeking reimbursement for meal expenses exceeding the TEP's $30.00 daily limit, regardless of the circumstances, and without any determination that the amount over $30.00 was not "necessary." On July 22, 2013 BRS wrote to UP and objected to the policy, but UP refused to rescind it. BRS responded on September 24, 2013 by filing its original complaint in this case, alleging, among other things, that the July 16 Expense Policy unilaterally abrogated the CBA's rules requiring reimbursement for actual and necessary meal expenses.

Undeterred, UP continued to apply the July 16 Expense Policy, and on October 23, 2013 BRS advised UP that on or after November 11, 2103, it would strike unless UP changed its position. On November 1, 2013, UP issued a revised meal expense policy (the "November 1 Expense Policy"). The November 1 Expense Policy no longer prohibits requests for reimbursement in excess of $30.00 per day, but instead states that "[a]ctual and necessary meal expenses are to be limited to $30.00 per day when held away from the headquarters for all three meals, including tips, except when the only options available necessitate the employee having to spend in excess of $30.00 in one day." (Policy Mem., ECF No. 11-1, at 33). It further states that receipts are not required for daily claims of $30.00 or less. (*Id.*).

On November 6, 2013, UP responded to BRS's original complaint with three filings: (1) the pending motion to dismiss for lack of subject matter jurisdiction (ECF No. 5); (2) a counterclaim seeking an injunction prohibiting BRS's threatened strike (ECF No. 7); and (3) the pending motion for a preliminary injunction (ECF No. 10).

On November 20, 2013, BRS filed its FAC, alleging that the November 1 Expense Policy violates the Railway Labor Act because (1) it unilaterally establishes a new flat rate for meal

reimbursements that do not require the submission of receipts or other evidence that the expenses were "necessary"; (2) it "unilaterally set[s] [a] flat rate at $30.00 per day regardless of where employees are assigned to work"[1]; and (3) the CBA's provision of actual and necessary meal expenses "does not require the employee to prove that no cheaper 'option' was 'available.'"(ECF No. 17, at 4–6).

On December 9, 2013, the Court heard oral argument on the pending motions and took evidence related to the motion for preliminary injunction. It now dismisses BRS's claims for lack of subject matter jurisdiction and grants UP's motion for a preliminary injunction.

## II.   Motion to Dismiss (ECF No. 5)

The dispositive issue in the instant motion to dismiss is whether the parties' disagreement over the November 1 Expense Policy raises a "major" or "minor" dispute under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, et seq. If the dispute is minor—the RLA term of art for a bona fide disagreement over the meaning of the Parties' existing CBA—then this Court lacks subject matter jurisdiction over, and must therefore dismiss, BRS's complaint, and the dispute must be resolved in binding arbitration. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 304 (1989) ("*Conrail*") ("A minor dispute in the railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjustment Board or before an adjustment board established by the employer and the unions representing the employees. The Board (as we shall refer to any adjustment board under the RLA) has exclusive jurisdiction over minor disputes.") (internal citations omitted). Moreover, under Supreme Court precedent, BRS is prohibited from engaging in a strike over a minor dispute, *Bhd. of R.R. Trainmen v. Chicago*

---

[1] The Court must note that this contention is unquestionably meritless. In its FAC and other moving papers, BRS repeatedly characterizes the November 1 Expense Policy as a flat rate, per diem meal expense policy. This is simply not the case. Under the plain terms of the policy, employees who spend more than $30.00 in a single day will be reimbursed for the excess amounts so long as they provide receipts and an explanation as to why the additional expenses were necessary. (*See* Policy Mem., ECF No. 11-1, at 33).

*River & I.R.R. Co.*, 353 U.S. 31 (1957) ("*Chicago River*"),[2] and this Court has subject matter jurisdiction to enjoin such unlawful job actions. *Conrail*, 491 U.S. at 304 ("Courts may enjoin strikes arising out of minor disputes.").

Accordingly, both of UP's pending motions require the Court to determine whether the dispute over the November 1 Expense Policy is "major" or "minor" within the RLA. The Court finds that the dispute is minor.

Major disputes seek to create contractual rights. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) ("*Hawaiian Airlines*"). In contrast, minor disputes involve discrepancies concerning the meaning of an existing collective bargaining agreement and are said to grow "out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." *Id.* at 248. "Minor disputes are not necessarily unimportant or insignificant. Indeed, minor disputes can involve disagreements of great practical or economic significance." *Ass'n of Flight Attendants v. Mesa Air Grp., Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009) (citing *Int'l Bhd. of Teamsters v. Sw. Airlines Co.*, 875 F.2d 1129, 1133 (5th Cir.1989) (en banc)).

The Supreme Court has elaborated on the distinction between major and minor disputes. Minor disputes:

> contemplate[ ] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the

---

[2] The specific question in *Chicago River* was whether a rail union could call a strike over a minor dispute pending before the Adjustment Board. *See Chicago River*, 353 U.S. at 31. The Court held that allowing such a strike "would render meaningless those provisions in the Act which allow one side to submit a dispute to the Board, whose decision shall be final and binding on both sides." *Id.* at 34 (emphasis omitted). The Act, in other words, requires the compulsory arbitration of minor disputes before the Adjustment Board, and strikes in that "limited field" are unlawful. *See id.* at 39.

employment relation, or asserted one, independent of those covered by the collective agreement, *e.g.,* claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Conrail*, 491 U.S. at 303 (quoting *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)) (internal quotations omitted). Indeed, the distinction between major and minor disputes "looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. *The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement*." *Id.* at 305 (emphasis added).

When "an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 307 (emphasis added). The burden to establish that an action is "arguably justified" by the terms of the CBA is "relatively light." *Id.* "When in doubt, courts construe disputes as minor." *Ass'n of Flight Attendants v. Mesa Air Grp., Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009) (citing *Bhd. of Locomotive Engineers v. Burlington N. R. Co.*, 838 F.2d 1102, 1111 (9th Cir. 1988)).

In the present case, the Parties disagree about whether UP's November 1 Expense Policy complies with their CBA, meaning that the entire dispute turns on the interpretation of an existing CBA. Therefore, under *Conrail*, if UP's implementation of the November 1 Expense Policy is arguably justified (i.e., nonfrivolous) under the terms of the CBA, the present dispute is minor, and the Court must dismiss. 491 U.S. at 307.

UP's claim that the November 1 Expense Policy complies with the CBA is at least arguably justified. Relevant to this dispute, Rules 13, 24, and 26 of the CBA require only that UP

reimburse BRS-represented employees for meal expenses that are both "actual" and "necessary." (CBA, ECF No. 11-1, at 9–11). The CBA includes no language, express or implied, regulating the procedures by which BRS members request reimbursement, document what they spend, or show that particular meal expenditures are necessary, (*Id.*), and UP claims that it issued the November 1 Expense Policy to regulate these procedural issues.[3] (Reply, ECF No. 25, at 4). Therefore, the November 1 Expense Policy is arguably justified by the plain terms of the CBA unless it is unambiguously inconsistent with BRS's contractual right to reimbursement for *actual* and *necessary* meal expenses. It is not.

Under the November 1 Expense Policy, all actual and necessary meal expenses will be paid. Employees who spend $30.00 or less enter their expenditures into the TEP and are reimbursed for their actual and necessary expenses. (Policy Mem., ECF No. 11-1, at 33). For employees who spend more than $30.00, UP will pay those amounts provided the employee proves that the expenses were "actual" (i.e., supported by receipts) and "necessary" (i.e., supported by "the reason why the additional expense was necessary."). (*Id.*) Therefore, because the November 1 Expense Policy provides for reimbursement of "actual and necessary" meal expenses, UP's position that it does not violate the CBA cannot be deemed frivolous.[4]

Citing to no authorities, BRS contends that because the CBA requires reimbursement of "actual and necessary" expenses, UP is not permitted to "develop rules for meal expense reimbursement, " and must instead determine whether an expense is necessary on a case-by-case

---

[3] Although BRS spends a significant portion of its opposition criticizing the $30.00 daily limit on meal expenses created by UP's July 16 Expense Policy, it is undisputed that the propriety of that policy is not before the Court. Instead, the only policy before the Court is the November 1 Expense Policy. As BRS admits, the November 1 Expense Policy eliminates the $30.00 daily limit. (Opp'n to Mot. for Prelim. Inj., ECF No 18, at 26).Thus, the entire question of whether UP can establish a hard cap of $30.00 is not before the Court.

[4] BRS offers a number of criticisms of the November 1 Expense Policy, but none show UP's arguments to be frivolous. First, BRS appears to object to the part of the November 1Expense Policy that does not require employees to submit receipts if their meal expenses are $30.00 or less. But BRS points to nothing in the CBA mandating that UP collect receipts for all meal expenses. The CBA requires that UP pay for actual meal expenses; it does not require UP to obtain receipts for every meal.

basis. (Opp'n to Mot. for Prelim. Inj., ECF No 18, at 25). As an initial matter, even if a "case-by-case" determination is necessary, UP's review of submitted receipts and supporting documentation appears to satisfy such a requirement. Moreover, BRS's claim that the CBA prevents UP from developing rules for reimbursement is inconsistent with persuasive authority, *Chicago & N. W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 155 (7th Cir. 1990) ("What the agreements do not expressly or impliedly forbid they permit"), and arbitral precedent: In NRAB Third Division Award 40842 an arbitrator interpreting the instant CBA approved the application of a $30.00 per day meal expense limit. (Award 40842, ECF No. 11-1, at 14-18). While the parties dispute the breadth of the NRAB's decision, there is no denying that the appropriate body has interpreted the CBA to allow for procedural rules of this kind. This, of course, only supports, if not requires, the conclusion that the November 1 Expense Policy is at least arguably justified (again, meaning nonfrivolous) under the terms of the CBA.[5]

BRS also complains that the November 1 Expense Policy requires employees who spend more than $30.00 to show that such expenditures were "the only options available" and to explain "why the additional expense was necessary." This assertion, however, is irrelevant, with respect to the present inquiry, unless UP's position is frivolous under the terms of the CBA. Again, it is not. As BRS admits, the CBA allows UP to require that meal expenses be "necessary." (Opp'n to Mot. for Prelim. Inj., ECF No 18, at 10). UP interprets "necessary" to mean "of an inevitable nature." (Mot. for Prelim. Inj., ECF No. 11, at 12) (citing www.merriamwebster.com/dictionary/necessary). While BRS is free to ask an arbitrator to adopt

---

[5] BRS contends that the Court should not consider Award 40842 because prior arbitration awards are not binding on future arbitrators. BRS's argument reveals a fundamental misconception of the relevant issue. The fact that an arbitrator interpreted the CBA to allow UP to establish rules regarding meal expense reimbursement demonstrates that UP's position that it can do so is not frivolous. BRS's argument that another arbitrator might read the CBA differently only proves that the parties have a bona fide dispute about the meaning of the existing CBA (i.e., that they have a minor dispute).

an alternative definition of "necessary," UP's interpretation is clearly not frivolous. Accordingly, the Court concludes that this is a minor dispute, and that it must be resolved through the RLA's arbitration mechanism. UP's motion to dismiss is therefore granted.[6]

Finally, to the extent that BRS contends that its filing of the FAC renders the motion to dismiss moot, the Court disagrees. Nothing in the FAC alters the Court's jurisdictional analysis. In fact, the amended portions describing the November 1 Expense Policy only underscore the conclusion that this is a minor dispute, over which the Court lacks subject matter jurisdiction. Therefore, the FAC is likewise dismissed.

///

///

_____

[6]A final point with respect to the major-minor jurisdictional analysis is worth noting: In its opening memorandum, UP offers evidence that that through past practices it has unilaterally created a number of different formal and informal procedures for the reimbursement of meal expenses for BRS-represented employees. BRS spends much of its opposition disputing UP's position on this point. However, for purposes of UP's motion to dismiss, the Court need not reach any of these issues. Moreover, because the Court can conclude that this is a minor dispute from the face of the CBA, it likely lacks subject matter jurisdiction to do so. As the Sixth Circuit deftly explained:

> The problem with the proffered evidence of prior practice is not that it proves nothing, but rather that it proves too little. The evidence is not devoid of probative value, but the probative value that the evidence does have, under the facts of this case, could not possibly change the result. It must be remembered that in cases where a railroad asserts that its action is justified by the terms of an agreement, courts are called upon to determine only whether the railroad's contention is arguable, not to determine whether that contention is correct. Given our limited function in this case, the proffered evidence cannot affect the outcome.

> The first step in cases of this type is, of course, to look at the agreement's language. If that language reveals that the railroad's position is obviously insubstantial and not even arguably correct, then the dispute is determined to be major and there is no need to resort to an examination of past practices. Past practices logically are relevant only when a railroad has already presented an arguably correct interpretation of the agreement. When this point has been reached, however, the inquiry is at an end. Past practice cannot make a construction which has already been determined to be arguable frivolous or a substantial argument insubstantial. Evidence such as this is to be used in determining the ultimate meaning of the agreement, *see Order of Railway Conductors of America v. Pitney*, 326 U.S. 561, 567 (1946), but that is a task for arbitrators, not for courts. When making only a provisional determination that the railroad's action is arguably sanctioned by the agreements, evidence of past practice is not dispositive in the face of contrary indications from the agreements' language.

*Bhd. Ry. Carmen of U.S. & Canada, AFL-CIO-CLC v. Norfolk & W. Ry. Co.*, 745 F.2d 370, 377 (6th Cir. 1984).

**III.    Motion for Preliminary Injunction (ECF No. 10)**

**a.  Subject Matter Jurisdiction**

After a lengthy, and largely needless, description of the Norris-LaGuardia Act (the "NLGA"), 29 U.S.C. §§ 101, et seq., BRS ultimately acknowledges that that the Supreme Court has specifically held that the NLGA does not prevent a court from enjoining strikes over minor disputes. (Opp'n to Mot. to Dismiss, ECF No. 18, at 23 (citing *Chicago River*, 353 U.S. at 40)). BRS is correct on this point; as the Supreme Court directly stated in *Conrail*, "[c]ourts may enjoin strikes arising out of minor disputes." 491 U.S. at 304.

**b.  Legal Standard**

While the Supreme Court has held that the specific provisions of the RLA take precedence over the more general provisions of the NLGA, *Bhd. of R. R. Trainmen v. Chicago R. & I. R. Co.*, 353 U.S. 30 (1957), it is unclear whether an injunction must meet the requirements set forth in Section 107 of the NLGA or those set forth in Federal Rule of Civil Procedure 65. *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 363 n. 9 (7th Cir. 2001); *Retail Clerks Union Local 1222 v. Lewis, Inc.*, 327 F.2d 442, 446–48 (9th Cir. 1964). However, UP is entitled to an injunction under either standard.

Section 107 of the NLGA requires that, after a hearing in open court, the Court must make findings of fact that (1) unlawful acts have been threatened and will be committed unless restrained; (2) substantial and irreparable injury to complainant's property will follow; (3) greater injury will be inflicted upon the complainant by the denial of relief than will be inflicted upon the opposing party by the granting of relief; (4) the complainant has no adequate remedy at law; and (5) the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection. 29 U.S.C. § 107.

Federal Rule of Civil Procedure 65 requires the consideration of similar factors: Under Rule 65(a), a party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Applying *Winter*, the Ninth Circuit has held that, to the extent previous cases suggested a lesser standard, "they are no longer controlling, or even viable." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). Thus, a party must satisfy each of these four requirements.

### c. Findings of Fact and Conclusions of Law

On December 9, 2013, the Court heard oral argument and considered relevant evidence concerning UP's motion for a preliminary injunction. The Court now makes the following findings of fact and conclusions of law:

UP communicated the substance of its November 1 Expense Policy to BRS on October 23, 2013. In response, BRS sent correspondence stating that it reserved the right to engage in a "strike, work stoppage, picketing, or other self-help" on or after November 11, 2013. ( Hanquist Decl., ECF No. 11-1, at 3). Because other UP labor union members will honor BRS's picket lines, (*Id.*), a strike by BRS could bring UP's train operations to a halt. Although BRS has agreed to delay the start of any job action until this Court rules upon the instant motion, it has not withdrawn the threat of a strike. Because this case raises only a minor dispute under the RLA, the threatened strike is unlawful. *Conrail*, 491 U.S. at 304; *Chicago River*, 353 U.S. at 30. Accordingly, UP has met its burden to show that unlawful conduct has been threatened and that it is likely to succeed on the merits. Thus, the first factor under both tests weighs towards injunctive relief.

The Court also finds that even a short works stoppage would cause UP to suffer millions of dollars of harm, resulting from increased operational costs, lost revenue, train delay, and penalty payments. (Stock Dec., ECF No. 11-3, at 2–4). UP has demonstrated that such harm would constitute substantial and irreparable injury to its property. In fact, BRS has stipulated that the threatened strike would cause irreparable harm. (Godiner Decl., ECF No. 11-2, at 3).  This stipulation is consistent with the numerous authorities holding that under the RLA unions cannot be required to pay damages caused by an illegal strike. *See, e.g.*, *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1327 (11th Cir. 2003) ("[I]njunctive relief is the first resort of courts when a union and carrier come before the court with an impending illegal strike threatening to disrupt carrier service."); *Norfolk S. Ry. Co. v. Bhd. of Locomotive Eng'rs*,  217 F.3d 181, 189-91 (4th Cir. 2000) ("The specific question for us is whether allowing damages for a strike over a minor dispute is consistent with the RLA's purpose and structure. We conclude that a damages remedy in this situation is at odds with the Act."); *Burlington N.R.R. Co. v. Bhd. of Maint. of Way Emps.*, 961 F.2d 86, 89 (5th Cir. 1992); *CSX Transp. Inc. v. Marquar*, 980 F.2d 359, 381-82 (6th Cir. 1992). Accordingly, if BRS is permitted to strike and the strike is later determined to be illegal, UP will have no mechanism to recover its damages. Thus, the second factor under Federal Rule 65 and the second and fourth factors under Section 107 of the NLGA (substantial and irreparable injury to UP and the fact that UP has no adequate remedy at law) also weigh towards granting the preliminary injunction.

The balance of the harms (the third factor under both tests) is likewise clear. As explained above, if BRS is permitted to strike, UP would suffer millions of dollars of irrecoverable damages. In contrast, if BRS is enjoined from striking, any member denied "actual and necessary" meal expenses can receive a remedy in arbitration. Furthermore, BRS offers no

meaningful arguments regarding the balance of harms. Instead, it argues only that it will be irreparably harmed if it is prevented from striking over a major dispute. (Opp'n to Mot. for Prelim. Inj., ECF No 18, at 35). Of course, this argument incorrectly assumes what the Court has already rejected: namely, that a major dispute exists.

Similarly, the public interest (the fourth and final Rule 65 factor) favors granting the injunction. Indeed, the Court finds that a strike by BRS, in addition to irreparably harming UP, would cause considerable damage and inconvenience to innocent bystanders, including other railroads and the citizens of the Chicago area. UP has established that much of its traffic interchanges with other railroads. (Stock Dec., ECF No. 11-3, at 2–4). If UP is unable to deliver or accept freight going to or coming from those railroads, those railroads will likely suffer significant damages. Furthermore, under an agreement with Metra, UP operates some of the commuter railroad lines in and around Chicago. (*Id.*). A work stoppage would implicate those lines, potentially inconveniencing a significant number of Chicago's commuters. (*Id.*). BRS's sole argument on this point is that the public interest favors the enforcement of federal laws, including the RLA and the NLGA. This is unpersuasive. As discussed above, both the RLA and the NLGA allow this Court to issue an injunction where, as here, a union threatens an unlawful strike. Moreover, the public interest clearly favors UP's requested injunction.

The final factor under Section 107 is inapplicable to the instant case. Therefore, UP has shown that each of the relevant factors weighs towards the issuance of an injunction under Section 107 of the NLGA. The Court's findings of fact also demonstrate that an injunction is plainly warranted pursuant to Federal Rule of Civil Procedure 65. Therefore, UP's motion for a preliminary injunction is granted.

**CONCLUSION**

IT IS HEREBY ORDERED that Union Pacific's Motion to Dismiss (ECF No. 5) is GRANTED. BRS's Complaint (ECF No. 1) and First Amended Complaint (ECF No. 17) are hereby DISMISSED for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED that Union Pacific's Motion for Preliminary Injunction (ECF No. 10) is GRANTED. BRS, its officers, agents, employees, and members, are hereby enjoined from initiating or participating in any strike, work stoppage, slow down, or any other self-help, intended to interfere with Union Pacific's normal operations, in any way related to Union Pacific's July 16th or November 1, 2013, meal expense policies.

IT IS SO ORDERED.

Dated:  December 11, 2013

_____
ROBERT C. JONES
United States District Judge